IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
|                *Plaintiff*, | Criminal No. 2:24-cr-90 - 1 |
|    v. | Hon. William S. Stickman IV |
| ISAAC WALLER, | |
|                *Defendant*. | |

**MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

A federal grand jury indicted Defendant Isaac Waller ("Waller") on April 24, 2024, with possession with intent to distribute crack in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count One), possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Two), and possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Count Three). (ECF No. 3). As to Count Three, on or about March 1, 2024, it is alleged that Waller possessed a firearm knowing that he had previously been convicted of the following crimes punishable by a term of imprisonment exceeding one year: (1) firearms not to be carried without a license, on or about April 8, 2015, at Docket No. CP-02-CR-0006475-2014, in the Court of Common Pleas of Allegheny County, Criminal Division, Commonwealth of Pennsylvania; (2) aggravated assault, on or about April 8, 2015, at Docket No. CP-02-CR-0006477-2014, in the Court of Common Pleas of Allegheny County, Criminal Division, Commonwealth of Pennsylvania; and (3) manufacture, deliver, or possession with intent to deliver, on or about August 3, 2021, at Docket No. CP-02-CR-0010891-2018, in the Court of Common Pleas of Allegheny County, Criminal Division, Commonwealth of

1

Pennsylvania. (*Id*. at 3). Waller filed two separate motions to dismiss the indictment against him. (ECF Nos. 62 and 63). In his first motion, he argues the indictment must be dismissed because violates the Commerce Clause and the Court lacks jurisdiction. (ECF No. 62). In his second motion, he argues that count three of the indictment must be dismissed because it violates the Second Amendment. (ECF No. 63). For the following reasons, the Court will deny Waller's motions.

## I.    STANDARD OF REVIEW

The Federal Rules of Criminal Procedure require that an indictment be a plain, concise, and definite written statement of the essential facts constituting the offense charged. FED. R. CRIM. P. 7(c)(1). An indictment is sufficient if it (1) includes the elements of the offense intended to be charged, (2) apprises the defendant of what he must be prepared to defend against at trial, and (3) enables him to plead a former acquittal or conviction in the event of a subsequent prosecution. *United States v. Rawlins*, 606 F.3d 73, 78-79 (3d Cir. 2010); *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007). An indictment that fails to charge all elements of a crime must be dismissed. *United States v. Cochran*, 17 F.3d 56, 57 (3d Cir. 1994). "No greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989). The Government is not required to provide precise details because the indictment "need not specify the theories or evidence upon which the government will rely to prove" its case. *United States v. Cochr*ane, 985 F.2d 1027, 1031 (9th Cir. 1993). A defendant is entitled to notice of the charges he faces, not "to know all of the evidence the government would use to prove the charges against him." *United States v. Mancuso*, 718 F.3d 780, 790 (9th Cir. 2013).

A motion to dismiss an indictment is governed by Federal Rule of Criminal Procedure 12 ("Rule 12") which states: "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1).

> [T]he scope of a district court's review at the Rule 12 stage is limited. "[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000) (citations omitted). "The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." *Id.* at 661. There is no criminal corollary to the civil summary judgment mechanism. *Id.* In evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual allegations set forth in the indictment. *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990). "Evidentiary questions—such as credibility determinations and the weighing of proof—should not be determined at this stage." *Bergrin*, 650 F.3d at 265 (internal marks and citation omitted). Thus, a district court's review of the facts set forth in the indictment is limited to determining whether, assuming all of those facts as true, a jury could find that the defendant committed the offense for which he was charged. *Panarella*, 277 F.3d at 685; *DeLaurentis*, 230 F.3d at 660.

*United States v. Huet*, 665 F.3d 588, 595-96 (3d Cir. 2012), *abrogated on other grounds*.

## II.    ANALYSIS

### A.  As-Applied Challenge to 18 U.S.C. § 922(g)(1)

Waller argues that § 922(g)(1) is unconstitutional as applied to him because the Government has not shown that he "continues to present a special danger of misusing firearms" or "in other words," that "he would likely pose a physical danger to others if armed." (ECF No. 63, p. 12). He argues as to his prior convictions: "it has been over 10 years since two of his three disqualifying convictions. He has matured greatly, is now a father, and has shown he is not a danger. Any prior conviction involving some element of violence is 10 years old." (*Id.* at 13); (*See also* ECF No. 70, p. 7 (arguing that Waller completed the sentences he received for his past convictions, and that any prior conviction involving violence is 10 years old)). The Government

counters that § 922(g)(1) is constitutional as applied to Waller's possession of firearms because he has been convicted of serious crimes, and it further notes:

> The defendant does not argue (and offers no evidence) that he possessed the gun in question for the only Second Amendment-protected purpose the Supreme Court has recognized: self-defense. His motion should be denied for that reason alone. Even if the defendant can overcome that deficiency, he does not grapple with the fact that the firearm he possessed was stolen, that he possessed it in furtherance of drug trafficking, that he has prior convictions for drug trafficking and other, serious dangerous offenses, or that he was on bond for another criminal case at the time of the instant offense.

(ECF No. 69, p. 39  (internal citation omitted)).

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.  In 2008, the Supreme Court of the United States held that, "on the basis of both text and history," the Second Amendment protects *an individual's* right to keep and bear arms.  *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (emphasis added).  The Supreme Court made clear, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited."  *Id*. at 626.  Relevant to the instant motion, the Supreme Court stated:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id*. at 625-27.  It further noted that "these presumptively lawful regulatory measures" were only examples and not an exhaustive list.  *Id*. at 627, n.26.  "[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us."  *Id*. at 635.

In June 2010, the Supreme Court held that the Second Amendment right, elucidated in *Heller*, is incorporated against the states. *See McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010). More specifically, it held that the "the right to keep and bear arms for the purpose of self-defense" in the home recognized by the Second Amendment "is fully applicable to the states." *Id*. The Supreme Court reiterated its observations in *Heller* that the right protected by the Second Amendment (like the rights protected elsewhere in the Constitution) is not unlimited and stated plainly: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here." *McDonald*, 561 U.S. at 786 (quoting *Heller*, 544 U.S. at 626-27). "[I]ncorporation does not imperil every law regulating firearms." *Id*.

Prior to 2022, courts within the Third Circuit applied a "means-end scrutiny" analysis in Second Amendment cases. *See Lara v. Comm'r of Pennsylvania State Police*, 125 F.4th 428, 433 n.9 (3d Cir. 2025) (citing cases). In 2022, the Supreme Court articulated an approach to addressing challenges invoking the Second Amendment in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). It rejected the kinds of tests developed by the appellate courts which employed a "means-end scrutiny." *Id*. at 17-20. In their place, the Supreme Court articulated a new test:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).  *Bruen* does not explicitly address the propriety of firearm possession bans for persons previously convicted of a felony crime; however, it refers to those falling under the protection of the Second Amendment as "law-abiding" people.  Thus, *Bruen* does not upset the Supreme Court's consistent endorsement of felon disarmament.  The Supreme Court explicitly stated that it is "[i]n keeping with *Heller*."  *Id*.

Then, in *United States v. Rahimi*, 602 U.S. 680, 692 (2024), the Supreme Court clarified that "the appropriate analysis" under *Bruen*'s second step "involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." Thus, challenged regulations are evaluated at a higher level of generality than whether "those regulations [are] identical to ones that could be found in 1791."  *Id*.  Rather than seeking out a perfect statutory analogue, "dead ringer," or "historical twin," courts must draw on "relevantly similar" historical regulations to derive "principles underlying the Second Amendment" and then ask if the modern-day regulation "comport[s] with th[ose] principles" in terms of "why and how it burdens the Second Amendment right."  *Id*.  Ultimately, the Supreme Court affirmed the denial of a motion to dismiss a defendant's indictment holding, "[w]hen a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may–consistent with the Second Amendment–be banned from possessing firearms while the order is in effect."  *Id*. at 690.

Following the *Rahimi* decision, the United States Court of Appeals for the Third Circuit directly applied *Bruen* in *Range v. Attorney Gen. United States of Am.*, 124 F.4th 218 (3d Cir. 2024) ("*Range II*").  The Third Circuit evaluated an as-applied challenge under *Bruen* to the prohibition on felons possessing guns in § 922(g)(1).  Range pleaded guilty in 1995 to making a

false statement to obtain food stamps.  At the time he pleaded guilty, his conviction was considered a misdemeanor punishable by up to five years of imprisonment.  This conviction precluded him from possessing a firearm under § 922(g)(1).  *Id*. at 223.  To reemphasize – Range was not a felon; he committed a nonviolent misdemeanor offense relating to false statements on paperwork for public benefits.  Range wanted to possess a hunting rifle and a shotgun for home defense, so he sought a declaration that § 922(g)(1) violates the Second Amendment as applied to him.

The Third Circuit applied the *Bruen* analysis and ruled in Range's favor.  After determining that Range was one of "the people" to whom the Second Amendment applies, and his proposed conduct (owning a hunting rifle) was protected by the Second Amendment, the Third Circuit then asked whether the Government carried its burden to justify stripping Range of that right.  *Id*. at 226-28.  In order to justify § 922(g)(1) as it applied to Range, the Government needed to show that the statute was "consistent with the Nation's historical tradition of firearm regulation."  *Id*. at 228 (quoting *Bruen*, 597 U.S. at 24).  The Third Circuit determined that the Government had not met its burden because a review of sources from the founding era and early Republic do not reveal that the disarmament of people like Range was practiced or contemplated.  Rather, a review of those sources demonstrated that at the time of the ratification of the Second Amendment, disarmament was limited to individuals who were viewed as dangerous to the community.  *Id*. at 229-31.  In other words, the Third Circuit held that the Government failed to show that the historical tradition of firearms regulation would have deprived Range of his Second Amendment right to possess a firearm in light of his conviction for making false statements on an application for public benefits.

Then, the Third Circuit in *Pitsilides v. Barr*, 128 F.4th 203 (3d Cir. 2025)[1] summarized

all of the above law as follows:

> The upshot of these cases is threefold: First, as *Bruen* and *Rahimi* make clear, our inquiry into principles that underlie our regulatory tradition does not reduce historical analogizing to an exercise in matching elements of modern laws to those of their historical predecessors. Instead, we must consider whether the principles embodied in different strands of historical firearm regulations, "[t]aken together," *Rahimi*, 602 U.S. at 698, 144 S.Ct. 1889, support contemporary restrictions, all the while remaining vigilant "not to read a principle at such a high level of generality that it waters down the right," *id.* at 740, 144 S.Ct. 1889 (Barrett, J., concurring).
>
> Second, whatever other recourse may or may not be available, felons seeking to challenge the application of § 922(g)(1) at least may bring declaratory judgment actions. But to grant such relief, the record must be sufficient for a court to make an individualized determination that the applicant does not presently pose the kind of danger envisioned by *Rahimi* and *Range II*. In keeping with *Heller's* conclusion that "the Second Amendment confers an individual right to keep and bear arms," 554 U.S. at 622, 128 S.Ct. 2783, that determination necessarily demands individualized fact-finding.
>
> Third, while *Rahimi* and *Range II* did not purport to comprehensively define the metes and bounds of justifiable burdens on the Second Amendment right, they do, at a minimum, show that disarmament is justified as long as a felon continues to "present a special danger of misus[ing firearms]," *Rahimi*, 602 U.S. at 698, 144 S.Ct. 1889, in other words, when he would likely "pose[ ] a physical danger to others" if armed, *Range II*, 124 F.4th at 232. Indeed, as Judge Bibas presciently observed even before *Bruen*, "[a]s an original matter, the Second Amendment's touchstone is dangerousness," *Folajtar v. Att'y Gen.*, 980 F.3d 897, 924 (3d Cir. 2020) (Bibas, J., dissenting); *see also Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("[L]egislatures have the power to prohibit dangerous people from possessing guns."), and our sister circuits have articulated the principle similarly in light of *Rahimi*, *see United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) (per curiam) ("The historical record demonstrates 'that legislatures have the power to prohibit dangerous people from possessing guns.'" (quoting *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting))); *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024) ("[O]ur nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous.");

---

[1] The Court acknowledges Waller's argument that *Pitsilides* was wrongly decided. (ECF No. 63, p. 2); (ECF No. 70, p. 5). It will not address his argument as the decisions of the Third Circuit bind the Court. *See In re Asbestos Prods. Liab. Litig. (No. VI)*, 384 F. Supp. 3d 532, 544 (E.D. Pa. 2019) ("The district court is the lowest court in our federal hierarchical system and is bound by rulings of its circuit court and the Supreme Court.").

*United States v. Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024) ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed.").

*Id*. at 210-11.

For the following reasons, the Court holds that Waller's "as applied" challenge fails.  The threshold question is whether Waller is one of "the people" protected by the Second Amendment despite having a prior felony conviction.  The Court holds that as an adult American, Waller is among the people presumptively protected by the Second Amendment.  *See Lara*, 125 F.4th at 438-39 (holding that all adult Americans are presumptively among "the people" to whom Second Amendment rights extend); *see also United States v. Moore*, 111 F.4th 266, 269 (3d Cir. 2024) ("As an adult citizen, Moore is one of the 'people' whom the Second Amendment presumptively protects."); *Range II*, 124 F.4th 218 (rejecting the argument that "the people" includes only law-abiding citizens); *Heller*, 554 U.S. at 580-81 (explaining that "'the people' as used throughout the Constitution unambiguously refers to all members of the political community, not an unspecified subset").

Having determined that Waller is one of "the people," the next questions are whether "'the Second Amendment's plain text covers [Waller's] conduct,' and 'the Constitution presumptively protects that conduct.'" *Bruen*, 597 U.S. at 17-19.  The Third Circuit in *Pitsilides* directed:

> Courts adjudicating as-applied challenges to § 922(g)(1) must consider a convict's entire criminal history and post-conviction conduct indicative of dangerousness, along with his predicate offense and the conduct giving rise to that conviction, to evaluate whether he meets the threshold for continued disarmament.  As *Range II* illustrated, consideration of intervening conduct plays a crucial role in determining whether application of § 922(g)(1) is constitutional under the Second Amendment.  *See* 124 F.4th at 232.  Indeed, such conduct may be highly probative of whether an individual likely poses an increased risk of "physical danger to others" if armed.  *Id.*

*Pitsilides*, 128 F.4th at 212.  Consequently, the Court will consider Waller's alleged criminal conduct and his criminal history.[2]

As to Waller's alleged criminal conduct in this case, the Government notes:  "the defendant does not dispute that he simultaneously possessed over 100 grams of crack cocaine with a pistol loaded with a round in the chamber and equipped with a loaded magazine – nor can he, as the entire episode was captured on the body worn cameras of Pittsburgh Bureau of Police Officers."  (ECF No. 69, p. 38).  Waller emphasizes that he is entitled to the presumption of innocence at this stage.  (ECF No. 7, p. 6).  But he has not argued that he possessed the firearm, which was stolen, for self-defense purposes.  It would be difficult for him to advance such an argument as he is classified as a person prohibited from possessing a firearm by virtue of his criminal history, let alone a stolen firearm.  The Court agrees with the Government that:

> The Second Amendment also "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. But "when [a] gun is stolen," it "cannot be justified as a lawful tool of self-defense." *United States v. Larry*, No. 22-1610, 2023 WL 2136782, at *1 (7th Cir. Feb. 21, 2023) (unpublished); accord *United States v. Harrison*, Crim. No. 23-129, 2023 WL 6795588, at *5 (W.D. Pa. Oct. 13, 2023); *United States v. Casey*, No. 23-392, 2023 WL 8600604, at *3 (E.D. Pa. Dec. 12, 2023). Stolen firearms are not in common use by law-abiding citizens – the Government has estimated that stolen guns represented just 0.32% of all firearms in the United States in 2020 – but they are used disproportionately in crime, in order to avoid background checks or thwart law enforcement. Response Brief, Bost, Dkt. No. 34 at 11-17; *see United States v. Mobley*, 956 F.2d 450, 454 (3d Cir. 1992). The defendant's possession of a stolen firearm thus does not fall within "the Second Amendment's plain text" at the first step of *Bruen*. 142 S. Ct. at 2126.

(ECF No. 35, pp. 31-32).  The Court also concurs with the Government that individuals are prohibited from possessing firearms to further their drug trafficking activities:  "[a]s numerous

---

[2] The Court is able to make factual determinations regarding Waller's indicted criminal conduct (recognizing the presumption of innocence) and his criminal history without an evidentiary hearing as he does not dispute the Government's summaries and does not request a hearing. (ECF No. 70, pp. 6-7).

courts have recognized, guns and drugs are a 'dangerous combination,' and drug-traffickers are 'dangerous and disruptive to society.'" (ECF No. 69, p. 38 (citation omitted)); *see also United States v. Napolitan*, 762 F.3d 297, 311 (3d Cir. 2014) ("Needless to say, while the Second Amendment secures 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home,' it does not entitle a drug trafficker to carry a firearm in furtherance of his criminal exploits[.]") (quoting *Heller*, 554 U.S. at 570) (internal citation omitted)); *United States v. Cash*, No. 22-2713, 2023 WL 6532644, at *3 n.6 (3d Cir. Oct. 6, 2023) (noting that "it is neither clear nor obvious that the Second Amendment encompasses the right to possess a firearm for the purposes of assisting or carrying out a drug crime."); *United States v. Waulk*, No. 3:20-cr-31-1, 2024 WL 3937489, *5 (W.D. Pa. Aug. 26, 2024) ("possessing a firearm in furtherance of a drug trafficking crime—falls firmly outside the ambit of the "conduct" to which the Second Amendment's protection applies."); *United States v. Carothers*, Case No. 3:20-cr-31-2, 2024 WL 1722521, *6 (W.D. Pa. April 22, 2024) (holding that the conduct at issue in the present case— possessing a firearm in furtherance of a drug trafficking crime—falls firmly outside the ambit of the "conduct" to which the Second Amendment's protection applies).

As to Waller's criminal history, the Government represents that as to his 2015 felony convictions for aggravated assault and possession of a firearm by a minor, the "aggravated assault conviction involved him illegally possessing a firearm and using it to shoot a juvenile female in the chest. (ECF 42-2)." (*Id.* at p. 41). Waller's "second 2015 conviction for firearms-related offenses involved him fleeing from police with an illegally possessed firearm when they tried to execute the arrest warrant issued for the aggravated assault. (ECF 42-3)." (*Id.* at 42). His "third conviction for firearms-related offenses involved him illegally possessing a stolen

firearm while he was released on bond pending sentencing for the aggravated assault case. (ECF 42-4)." (*Id*.).

Waller's criminal history demonstrates that he has engaged in conduct reasonably likely to cause danger to life and limb and general mayhem. Further, it indicates a potential for violence. Courts have found that the specific crimes for which Waller has been convicted indicate that an individual poses a danger of misusing firearms in a way that would endanger others. *See United States v. Johnson*, Criminal Action No. 23-77, 2023 WL 6321767, at *3 (E.D. Pa. Sept. 27, 2023) ("[The defendant's] prior convictions are for unlawfully carrying firearms and receiving stolen property. Those convictions indicate that he presents a potential danger to society and cannot be trusted to obey firearm regulations." (internal citations omitted)); *United States v. Roach*, Case No. 2:24-cr-00077, 2025 WL 871618, *3 (E.D. Pa. Mar. 20, 2025) (stating that "even a conviction for simple assault. . . demonstrates a defendant's dangerousness"); *United States v. White*, No. 23-3013, 2025 WL 384112, at *2 (3d Cir. Feb. 4, 2025) (stating that prior felony convictions for drug distribution, aggravated assault, and carrying a firearm without a license demonstrate he "present[s] a special danger of misus[ing firearms]"); *United States v. Hall,* No. 23-1430, 2024 WL 510512, at *1-2 (3d Cir. Feb. 9, 2024) (discussing long criminal record, including two convictions for aggravated assault, five for drugs, and two for possessing weapons). Waller's past crimes did (or could have) put another's safety at risk.[3] Therefore, a finding of danger is justified. The Court holds that Waller poses a danger of misusing firearms in a way that would endanger others.

---

[3] The Court concurs with the Government's discussion on pages forty-three to forty-four of its response that Waller's prior drug trafficking activities also pose a significant threat of danger. (ECF No. 69, pp. 43-44).

Relatedly, the Court finds that Waller is unlike Range, a civil litigant seeking a declaratory judgment so he could buy a hunting rifle. Range had one prior conviction for making a false statement to procure food stamps. *Range II*, 124 F.4th at 222-23. Waller is charged with being a felon in possession of a firearm and he has prior convictions for drug trafficking and other serious, dangerous offenses. Further, Waller did not file a civil lawsuit to assert his Second Amendment claim but "knowingly violated § 922(g)(1)'s prohibition while subject to it." *See Pitsilides*, 128 F.4th at 210. This knowing violation of federal criminal law also shows that Waller poses a risk of unlawful violence toward others. The Third Circuit's narrow holding that § 922(g)(1) was unconstitutional as applied to Range does not extend to Waller, who is differently situated.

The Court holds that § 922(g)(1) is constitutional as applied to Waller.

## B. Facial Challenge to § 922(g)(1)

Waller further argues that § 922(g)(1) is facially unconstitutional because it (1) is not supported by founding-era analogues and (2) is unconstitutionally vague. (ECF No. 63, pp. 13-16). "A party asserting a facial challenge 'must establish that no set of circumstances exists under which the [challenged statute] would be valid.'" *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). The Court's holding that § 922(g)(1) is constitutional as applied to Waller forecloses any facial challenge to the statute because he cannot show § 922(g)(1) is unconstitutional in all circumstances if there is a circumstance in which the statute is constitutionally applied. *See United States v. Blackshear*, Criminal Action No. 23-159, 2023 WL 5985284, at *3 (E.D. Pa. Sept. 14, 2023) ("[The defendant] cannot show that § 922(g)(1) is unconstitutional as applied to his case, let alone in all

circumstances."). Nonetheless, the Court will briefly address Waller's facial challenges to § 922(g)(1).

> a. *Founding Era History*

Waller argues that § 922(g)(1) is facially unconstitutional because the Government has not established a founding-era tradition of disarming individuals with felony convictions. (ECF No. 63, pp. 13-14). The Government counters that Waller's facial challenge fails because it has established historical analogues and, further, Waller cannot establish that § 922(g)(1) is unconstitutional in all circumstances. (ECF No. 35, pp. 46-47).

The Court holds that § 922 (g)(1) is not facially unconstitutional as § 922(g)(1)'s ban on firearm possession is consistent with our country's historic tradition of regulating firearms. While, as *Range* observed, there is no historical tradition from the colonial era or early Republic categorically disarming those merely convicted of crimes (particularly, crimes relating to the sort of conduct that Range committed), there is a long history of disarming people who pose a danger to society. As early as the seventh century, English law permitted the disarmament of violent and dangerous people. Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 258 (2020) (citing *Ancient Laws and Institutes of England* 3 (Benjamin Thorpe ed., 1840) (describing the Laws of King Aethelbirht as banning the provision of arms to another "where there is strife"). A millennium later, in the seventeenth century, King Charles II ordered the Lord Mayor of London to disarm "dangerous and disaffected persons." *Id.* at 259 (citing 10 *Calendar of State Papers, Domestic Series, Domestic Series of the Reign of Charles II, 1660-1670* 237 (1895)). This included Catholics who, following the failed gunpowder plot, were viewed as disloyal and potentially

dangerous. *Id.* at 258 (citing 1 *Stuart Royal Proclamations: Royal Proclamations of King James I 1603-1625*, 247-48 (June 2, 1610) (James F. Larkin & Paul I. Hughes eds., 1973)).

     Colonial laws mirrored English models and similarly disarmed those persons viewed as a danger to public order, including Native Americans, Catholics, Quakers, enslaved persons, and freed Black people. Such laws imposing discriminatory class-wide disarmament would undisputedly fail both moral and constitutional scrutiny under modern standards. Nevertheless, they demonstrate that at the time of the founding, the American colonists were accustomed to laws depriving persons who they perceived as posing a special threat to society from possessing firearms. Colonial laws also disarmed those whose actions made them a danger to the community. Laws passed in Massachusetts and New Hampshire forbade the carrying of arms "in an aggressive and terrifying manner." *Id.* at 262. Likewise, Virginia allowed the disarmament of those "who ride, or go, offensively armed, in Terror of the People." *Id.* at 262 (citing George Webb, *The Office of Authority of a Justice of the Peace* 92-93 (1736)).

     At the time of the ratification of the Second Amendment, the framers and the people understood that the right to keep and bear arms extended to all "peaceable" citizens. Greenlee, *The Historical Justification*, 20 WYO. L. REV. at 266 (citing 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 675 (1971)); *see also* Stephen Halbrook, THAT EVERY MAN BE ARMED 86 (revised ed. 2013) ("[T]he Second Amendment…originated in part from Samuel Adams's proposal . . . that Congress could not disarm any peaceable citizens."). Samuel Johnson's dictionary from the time of ratification defined "peaceable" as "1. Free from war; free from tumult; 2. Quiet; undisturbed; 3. Not violent; not bloody; 4. Not quarrelsome; not

turbulent."  2 Samuel Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (5[th] ed. 1773).[4]  The

prevailing view that "peaceable" citizens were secure in their right to keep and bear arms

excluded those who did not fall within that definition—those who were, conversely, dangerous.

As Third Circuit Judge Thomas M. Hardiman's concurring opinion in *Binderup v. Att'y Gen.*

*United States of America*, 836 F.3d 336, 368 (3d Cir. 2016) observed:

> [T]he debates from the Pennsylvania, Massachusetts and New Hampshire
> ratifying conventions, which were considered "highly influential" by the Supreme
> Court in *Heller*…confirm that the common law right to keep and bear arms did
> not extend to those who were likely to commit violent offenses.  Hence the best
> evidence we have indicates that the right to keep and bear arms was understood to
> exclude those who presented a danger to the public.

(internal citations omitted).

The disarming of people who pose a danger to society is deeply rooted in our country's

legal traditions.  "The right to keep and bear arms always has been subject to careful limitations,"

which "are at their zenith when applied to people who are the antithesis of the law-abiding

citizen who wants to exercise his or her right to self-defense, whether at home or in public, and

who may also enjoy the various sports and other activities that involve guns." *Atkinson v.*

*Garland*, 70 F.4th 1018, 1037 (7th Cir. 2023) (Wood, J., dissenting).  Holding that § 922(g)(1) is

facially unconstitutional would strip Congress of its ability to protect the public from a clear and

present danger.  That is not something that the Court is willing to condone.  The Court finds that

there are founding-era analogues for disarming individuals who pose a danger to society and that

§ 922(g)(1) is not facially unconstitutional.

---

[4]  Johnson's dictionary is an authoritative resource for the meaning of words as understood by
the founding generation.  The Supreme Court cited to it in *Heller* to interpret the language of the
Second Amendment.  *See Heller*, 554 U.S. at 582-84.

####### *b.  Vagueness*

Waller argues that § 922(g)(1) is unconstitutionally vague.  (ECF No. 63, pp. 14-16).

The Court holds that § 922(g)(1) is not unconstitutionally vague.  "A conviction fails to comport

with due process if the statute under which it is obtained fails to provide a person of ordinary

intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages

seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  In

resolving a vagueness challenge, courts consider "whether [the] statute is vague as applied to the

particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed

cannot complain of the vagueness of the law as applied to the conduct of others.'"  *Holder v.

Humanitarian L. Project*, 561 U.S. 1, 18-19 (2010) (internal quotation marks omitted).  The

"mere fact that close cases can be envisioned" is not sufficient to render a statute vague because

"[c]lose cases can be imagined under virtually any statute."  *Williams*, 553 U.S. at 305-06.

"'Section 922(g)(1) is not vague as it clearly bars the possession of a firearm by any

person who has previously been convicted of a crime punishable by more than one year in prison

(or of certain misdemeanors as specifically defined).'"  *United States v. Johnson*, No. 2:24-CR-

127, 2025 WL 276752, at *4 (W.D. Pa. Jan. 23, 2025) (quoting *United States v. Ames*, No. 23-

178, 2023 WL 5538073, at *3 (E.D. Pa. Aug. 28, 2023)).  Further, because § 922(g)(1) contains

a *mens rea* element (i.e., the Government must prove that the defendant actually knew that he

had been convicted of a crime punishable by imprisonment for a term exceeding one year), it is

"less likely that a defendant will be convicted for an action that he or she committed by mistake."

*United States v. Fullmer*, 584 F.3d 132, 152 (3d Cir. 2009).  Such fact alleviates vagueness

concerns.  *Id*.  Moreover, § 922(g)(1) is not vague as applied to the particular facts at issue. The

plain text of the statute makes clear that a convicted felon is prohibited from possessing a

firearm.  The statute applies to Waller given his prior convictions and the danger he poses to others if he were armed.

### C. Commerce Clause

In purporting to raise the argument for preservation purposes, Waller argues that all three counts charged in the indictment – violations of  18 U.S.C. §§§ 922(g)(1), 841(a)(1) and (b)(1)(C), and 924(c)(1)(A)(i) – constitute an unlawful exercise of Congress' power under the Commerce Clause.  (ECF No. 62).  He concedes that his arguments are foreclosed.  (*Id*.).  The Court holds that Waller's arguments are indeed foreclosed by binding precedent and that they do not provide a basis for the dismissal of the charges against him.  *See United States v. Singletary*, 268 F.3d 196, 204-05 (3d Cir. 2001) (rejecting argument that Congress exceeded authority given by Commerce Clause when enacting § 922(g)(1)); *United States v. Penn*, 870 F.3d 164, 165 n.2 (3d Cir. 2017) (reaffirming *Singletary*); *Gonzales v. Raich*, 545 U.S. 1 (2005) (holding that Congress may regulate the intrastate production, possession, and distribution of controlled substances based on the aggregate effect such activity has on interstate commerce); *United States v. Cidone*, 452 F. App'x 190 (3d Cir. 2011) ("We have no difficulty holding that federal laws regulating food and drugs under Title 21 of the U.S. Code, including 21 U.S.C. § 841, under which [defendant] was convicted, are constitutional" under the Commerce Clause); *United States v. Brownlee*, 454 F.3d 131 (3d Cir. 2006) (holding that using a firearm in relation to a federal crime of violence (18 U.S.C. § 924(c)(1)(A)(ii)) and possession of a firearm by a convicted felon (18 U.S.C. § 922(g)(1)) survive constitutional scrutiny).

### III.    CONCLUSION

For the foregoing reasons, the Court will deny Waller's motions to dismiss the indictment

(ECF Nos. 62 and 63).  An Order of Court will follow.

BY THE COURT:


s/  William S. Stickman IV
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE


November 7, 2025
Dated